**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Kathleen M. Gliebe, | | Case No. 1:10-CV-002566 |
| Plaintiff, | : | JUDGE LESLEY WELLS |
| v. | | MAGISTRATE JUDGE ARMSTRONG: |
| Michael Astrue Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3)  of Defendant's final determination  denying her claim for period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423.   Pending are the parties' briefs on the merits (Docket Nos. 7 & 12).   For the reasons that follow, the Magistrate Orders that the Commissioner's decision be AFFIRMED.

## I. Procedural Background

Plaintiff Kathleen Gliebe applied for Social Security Period of Disability and Disability Insurance Benefits on August 24, 2005, with alleged onset date of September 21, 2004.  (Tr. 61-65).    Plaintiff's application was processed and denied by the Bureau of Disability Determination of the State of Ohio, initially on  November 10, 2005 and upon reconsideration, August 10, 2007.  (Tr. 48-49, 52-54).  On September 18, 2007 Plaintiff filed a request for Review before an ALJ. (Tr. 47).

On December 8, 2008, a hearing was conducted before ALJ Peter R. Bronson.  (Tr. 342-403).

Plaintiff was granted the opportunity to submit post-hearing evidence, which included a post-hearing brief,

post-hearing interrogatories to the medical expert, and medical records not previously available. On January

7, 2009, Plaintiff submitted her post-hearing evidence to the ALJ.  (Tr. 66).  On May 28, 2010, the ALJ

issued an unfavorable Decision. (Tr. 8-29A).  After considering the testimony and other evidence of record,

the ALJ concluded that, prior to the expiration of her insured status on December 31, 2009, Plaintiff's

impairments did not, alone or in combination, meet or equal any of the impairments listed in the applicable

Social Security regulations (the Listings) (Tr. 16-18). The ALJ further found that Plaintiff had the residual

functional capacity (RFC) to perform a reduced range of sedentary work (Tr. 18-19), and that she could

perform her past relevant work, as it is usually done in the national economy.  (Tr. 23).  On July 14, 2010,

Plaintiff filed a request for review with the Appeals Council.  On September 10, 2010, the Appeals Council

denied Plaintiff's request for review.  (Tr. 3-7).

Thereafter, on November 9, 2010, Plaintiff filed her Complaint with this Court.  (Docket No. 1).

**II Jurisdiction**

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C.

§ 405(g) and 42 U.S.C. § 1383(c)(3).  McClanahan v. Commissioner of Social Security, 474 F.3d 830, 832-

33 (6th Cir. 2006).

**III Legal Issues**

The following issues are before this Court for review:

1.    Whether the ALJ applied properly - within the context of all relevant medical evidence,
      including other evidence promulgated by the treating physician, other medical source
      evidence generally, other medical evidence, as well as Plaintiff's self-assessment and related
      issues of weight and credibility - the "treating physician" rule to opinions asserted by
      Plaintiff's treating physician in reaching his decision that Plaintiff was not disabled.

2     Whether Plaintiff's impairment meets or equals the listed impairment requirements of Listing

1.04(a) within the scheme set forth in 20 C.F.R. pt. 404, subpt. P, app. 1

3.  Whether Plaintiff retains sufficient residual functional capacity to enable her to work and whether there are jobs in the economy that she can perform given such limitations as she might have.

(Plaintiff's Brief on the Merits, Docket No. 7, 2, and Defendant's Brief, Docket No. 12, 1).

**IV Relevant Facts**

The following facts are relevant, to an understanding of the issues before this Court

**Plaintiff's History**

Plaintiff Kathleen Gliebe was born on April 18, 1953 and was 55 (fifty-five) years old on the date of the hearing. Claimant's relevant work history was a cashier at Heinen's grocery store for eight years, an office clerk at Forest City, and a home health aide at Parma Hospital.  Ms. Gliebe's last date worked was September 21, 2004.  (Plaintiff's Brief on the Merits, Docket No. 7., 2).

**Plaintiff's Medical History**

The following is a time line of Plaintiff's relevant medical history and relevant health care providers.

**1978 laminectomy**

In 1978, Ms. Gliebe had a lumbar laminectomy performed at the L5-S1 area of her spine for lumbar disc herniation.  (Tr. 313, 325.).

**2004, slip and fall. MRI**

On July 10, 2004 suffered a slip and fall accident on a wet floor at a local grocery store. (Tr. at 313, 325.)  In September 2004, around the time that Plaintiff alleged she was disabled, she went to the doctor complaining that she had pain in her back that radiated to her leg (Tr. 226). On examination, she had normal muscle strength and normal reflexes (Tr. 226).  She was assessed as having lumbar radiculopathy and advised to have a Magnetic Resonance Imaging (MRI) scan   (Tr. 226).

An MRI performed on September 27, 2004 showed mild disc space narrowing and degeneration at

3

the L4-5 and L5-S1. (Tr. 311.)

**2004, Dr. Grenier, M.D.**

The following month, Yannick Grenier, M.D., wrote a letter to Brian Zelis, M.D. (Tr. 263). Dr. Grenier noted that he had reviewed Plaintiff's MRI and that it revealed very minimal scarring, degeneration and some impingement but no nerve compression on the nerve root. (Tr.264). He also noted that Plaintiff had radicular pain, but he said the source of the pain was not readily accounted for by the findings on the MRI (Tr. 264). He prescribed medication and noted that he would consider whether Plaintiff was a candidate for physical therapy. (Tr. 264).

**2005, MRI**

In January 2005, Plaintiff had another MRI of the lumbar spine (Tr. 309). It revealed mild degenerative and post surgical changes in the lower spine (Tr. 309). There was also mild protrusion but it did not appear to impinge on the nerve root. (Tr. 309). Overall, it was similar to the MRI in September 2004. (Tr. 309).

**2005, Dr. Mroz, M.D.**

In April 2005, Plaintiff saw Thomas Mroz, M.D., for a second opinion. (Tr. 304). On examination, Dr. Mroz noted that Plaintiff had diminished sensation in her lower back, but normal muscle strength in her upper and lower extremities and normal reflexes. (Tr. 305). He concluded that Plaintiff had probable lumbar radiculopathy and a small disc herniation. (Tr. 306).

**2005, Dr. Choi, M.D.**

Later that month, Plaintiff was referred to Charles I. Choi, M.D. (Tr. 313). On examination, Dr. Choi noted that Plaintiff's gait was antalgic on the left side and that she had some discomfort standing and sitting, but that she could heel-to-toe walk and had normal reflexes. (Tr. 313). He concluded that

4

Plaintiff was a candidate for nerve root blocks and steroid injections.  (Tr. 314). He also noted that, if refractory,  she could be a candidate for lumbar disc decompression.  (Tr. 314).

### 2005, Dr. Mroz, MRI

In May 2005, Plaintiff had several lumbar injections.  (Tr. 317, 318, 319).  She told Dr.Mroz they did not relieve her pain.  (Tr. 303).  On examination, Dr. Mroz noted that she had limited range of motion and diminished sensation, but normal reflexes, full muscle strength and negative straight leg raising on the left leg.  (Tr. 303).  He further noted that the first series of injections were applied improperly, so he ordered another series.  (Tr. 303).  In June 2005, Plaintiff had another injection  (Tr. 299), but she said that it failed to relieve her pain.  (Tr. 292).

On June 20, 2005, Dr. Mroz diagnosed "broad-base disc herniation at L4-L5, which is conjunction with congenital stenosis, resulted in a fair amount of central and bilateral lateral recess stenosis at L4-L5." (Tr. 297).   This diagnosis was confirmed by another MRI taken on June 28, 2005 which found stenosis at L4-5. (Tr. 308).  Dr. Mroz concluded that he was not convinced that the source of her pain was spinal in origin.  (Tr. 292).  He referred her to the orthopaedic department.  (Tr. 292).

### 2005, Dr, Zachary, D.O.

Two months later, Plaintiff was referred to by Adrian M. Zachary, D.O., when her treatment, including seven nerve blocks, failed to result in relief.  (Tr. 287, 289).  Plaintiff told Dr. Zachary that she was able to do minimal physical activity and exercise.  (Tr. 287).   On examination, Dr. Zachary found focal sensory deficits present in the left L5 and S1 dermatomes, nerve root tension signs present to left SLR testing and  reduced lumbar range of motion. (Tr.288).  Dr. Zachary stated that Ms. Gliebe "is suffering from chronic radiculitis likely related to traction injury to the L5 nerve root possibly from epidural fibrosis." (Tr. at 288).  Dr. Zachary noted that Plaintiff had reduced lumbar range of motion, pain on straight leg raising and sensory deficits.  (Tr. 288).  He also noted that Plaintiff's gait was

5

normal, the range of motion in her neck was normal, she could heel-to-toe walk, and she had no muscle atrophy.  (Tr. 288).  He further noted that three out of five Waddell signs were present.  (Tr. 288).  Dr. Zachary referred Plaintiff to a pain management program.  (Tr. 288).

### 2005, Dr. Zelis, M.D.

During this time, mid-2005, Ms. Gliebe developed hypothyroidism and began to suffer from depression. (Tr.t 282-83).  Dr. Brian Zelis, M.D. stated that plaintiff's back pain is exacerbated or aggravated by walking, sitting, standing, bending, or laying.  (Tr. 282).  He additionally stated that, while plaintiff's hypothyroidism may not be enough to prevent her working, the combination of depression and hypothyroidism exacerbate Ms. Gliebe's chronic back pain. (Tr. 283).

In October 2005, Dr. Zelis wrote a letter to the state agency about Plaintiff's medical condition. (Tr. 282-83).  He noted that Plaintiff had reported pain in her back, left leg, and ankle.  (Tr. 282).  He said Plaintiff received some relief from her medications. (Tr. 282).  He also noted that Plaintiff's previous MRI showed a broad disc bulge, without significant foraminal stenosis.  (Tr. 282).  He opined that Plaintiff's limitations were complete for any type of physical job or any job where she would have to sit or stand for prolonged periods of time in one position. (Tr. 283).

### 2006, Dr. Anderson, M.D,

In February 2006, Plaintiff underwent a neurologic examination.  (Tr. 271).  James S. Anderson, M.D., noted that Plaintiff's gait was slow and she had decreased sensation in her legs, but she could heel-to-toe walk without difficulty.  (Tr. 272).  He also noted that Plaintiff had normal muscle strength in her upper and lower extremities and normal reflexes.  (Tr.272).  Dr. Anderson did not see any neural element compression, nor loss of neurologic function.  (Tr. 272).  He pointed out that Plaintiff's hamstring reflex was present.  (Tr. 272).  He said that was significant because it meant that she had function in her lower back.  (Tr. 272).  He concluded that Plaintiff strained her back and was developing

6

chronic pain syndrome. (Tr. 272). He did not think surgery would benefit Plaintiff. (Tr. 272). He recommended a pain management program. (Tr. 272).

### 2006, motor vehicle accident, Dr. Nickels, M.D.

On April 28, 2006 Ms. Gliebe was involved in a motor vehicle collision. (Tr. 196). After the accident, Ms. Gliebe's cervical spine range of motion was restricted in all planes, cervical compression test was positive bilaterally, her left lower extremity noted decreased sensation to light touch, and her seated straight leg raise was positive bilaterally. (Tr.198, 204). At this time, Plaintiff was also being seen by John Nickels, M.D. (Tr. 165-66).

### 2006, Dr. Bartal, DPM

In 2006, Ms. Gliebe was also first diagnosed with plantar fasciitis. (Tr. 216). She began to see Dr. Joseph Bartal, D.P.M. in February of 2008, who observed that her severe, chronic pain would not go away until her spinal problem is corrected. (Tr.121)

### 2006, Dr. Levak, D.C.

In April 2006, Plaintiff began receiving treatment at the spine rehabilitation clinic. (Tr. 207). At the initial appointment, Chiropractor Steven A. Levak, D.C., noted that Plaintiff underwent physical therapy treatment and tolerated it well. (Tr. 205). He recommended that Plaintiff begin an active rehabilitation program. (Tr. 205).

Over the next several months, Plaintiff continued to receive treatment from Dr. Levak. In May 2006, Plaintiff reported decreased symptoms. (Tr. 201, 202). She noticed greater mobility after doing the exercises. (Tr. 201, 202). In June 2006, Dr. Levak summarized Plaintiff's treatment. (Tr. 196-99). He said the treatment Plaintiff had received returned her to her pre-accident status, however, he felt she would have flare-ups and pain and stiffness in the future. (Tr. 199). He concluded that she could control her pain and stiffness with medications and a home exercise program. (Tr.199).

7

In August 2006, Plaintiff resumed care with Dr. Levak.  (Tr.195).  She complained that she was still experiencing a moderate amount of pain.  (Tr. 195).  On examination, her range of motion was limited, she had decreased sensation in her lower extremities, and she had positive straight leg raising on the left.  (Tr.195).  However, her muscle strength was normal, her reflexes were normal, and she had no pain in her cervical spine.  (Tr. 195).  Dr. Levak advised Plaintiff to begin physical therapy.  (Tr. 195).

Plaintiff continued to report that she was experiencing pain.  (Tr. 183, 191-93) . Dr. Levak advised her to continue physical therapy, and noted that she tolerated the therapies well. (Tr.183, 191-93).                                  **2007, Physical Therapist Rubinski**

In January 2007, Plaintiff began physical therapy.  (Tr. 161).  Physical therapist Dan Rubinski noted that Plaintiff had decreased strength and poor compression, and rated her own pain level as a "3/4" or "6/8," on a 1 to 10 scale.  (Tr. 161).  He advised her to attend therapy three times a week for four weeks.  (Tr. 161).  Her progress outlook was "very good" (Tr. 161).

**2007, Dr. Nickels, M.D.**

In August 2007, John Nickels, M.D., wrote a letter about Plaintiff's treatment in April and June 2006.  (Tr. 165-66).  Dr. Nickels said that in June 2006, Plaintiff had pain in her lower back and neck, that radiated to her left leg.  (Tr. 166).  He reviewed her MRI from June 2005 and found degenerative changes and mild stenosis but no recurrent herniation and no significant changes from her January 2005 MRI.  (Tr. 166).  Due to Plaintiff's work injury and motor vehicle accident, in April 2006, he stated that Plaintiff had lumbar radiculopathy with disc herniation and opined that Plaintiff was "completely and totally disabled and unable to do any work whatsoever."  (Tr. 166).

**2008, MRI**

Another MRI of the lumbar spine was conducted on January 11, 2008.  This MRI showed disc bulging at L5-S1 and L4-5, as well as "broad based disc herniation…which also appears to have

8

progressed since the previous study." (Tr.160).  The MRI revealed degenerative changes, bulging and mild-to-moderate canal narrowing, but no significant interval change.  (Tr.160).

### 2008, Physical Therapist Rubinski

Later that month, Plaintiff returned to physical therapy.  (Tr. 147-48).  She attended therapy three times a week for one month.  (Tr. 149-50).  After ten sessions, she was discharged.  (Tr. 145).  Mr. Rubinski noted that Plaintiff reported some improvement, including decreased pain and improved hip and knee strength.  (Tr.145).

### 2008, Dr. Bartal, D.P.M.

Later that month, Plaintiff began complaining that she had pain in the bottom of her left heel  (Tr. 121).  On examination, Dr.Bartal, noted that Plaintiff had severe pain on palpation and decreased range of motion, but an intact neurovascular system.  (Tr.121).  The podiatrist also noted that her muscle strength was normal.  (Tr.121).  He recommended conservative treatment.  (Tr.121).

In April 2008, Plaintiff returned to Dr. Bartal.  (Tr.119).  She reported significant improvement since the last visit; overall, she was 80% to 90% better.  (Tr. 119).  Two months later, in June 2008, Plaintiff said she had a complete resolution of all of her symptoms, but had a flare-up after she walked several hills in San Francisco.  (Tr. 118). Dr. Bartal advised her to continue icing and stretching as directed.  (Tr.118).

### 2009, Dr. Zelis, M.D.

Dr. Zelis completed a physical residual functional capacity report on January 9, 2009.  (Tr. 335-41). In his report he opined that Ms. Gliebe could lift or carry no more than ten pounds occasionally or frequently, could stand only two to three hours per eight-hour work day, and could only sit less than two hours in an eight-hour work day without alternating between sitting, lying and standing. (Tr.110, 336). Dr. Zelis further opined that Ms. Gliebe's limitations were caused by the "L4-5 and L5-S1 disc

protrusions [causing] hernia and sciatica inflamed by prolonged sitting, standing, etc." (Tr.110).   Dr. Zelis further stated that Ms. Gliebe can only balance occasionally, could not push or pull with her left leg, could not  climb ramps, steps, ladders, ropes or scaffolds, could not stoop, kneel, crouch or crawl because these maneuvers increase pressure that induces pain in the leg and through the buttocks, and should avoid concentrated exposure to extreme cold or heat, fumes, odors, dusts, gases, poor ventilation and other air pollutants.. (Tr. 111, 336-39)   Dr. Zelis also noted that Plaintiff should avoid being around moving machinery, heights and other workplace hazards (Tr. 339).

Following the hearing conducted on December 8, 2008, claimant submitted additional records that were not available at the time of the hearing. These records included treatment notes from Southwest Foot and Ankle Associates, (Tr.118-21), as well as records from claimant's endocrinologist, Monica Gilga, M.D. (Tr.122-29).  Of note, the records from Dr. Bartal reflect that Ms. Gliebe was experiencing severe left foot pain (Tr. 121)  On February 26, 2008, Dr. Bartal described "severe post attic dyskinesia, pain is worse in the morning." (Tr. 121).

## V. ALJ Findings of Fact and Conclusions of Law

On May 28, 2010, after consideration of the entire record, and in accordance with the five step sequential analysis, the ALJ Peter R. Bronson made the following findings of fact and conclusions of law after the final hearing held on December 8, 2008[1]:

Plaintiff met the insured status requirements of the Social Security Act on April 1, 2001 and

---

[1]     At the conclusion of the December 8, 2008 hearing the ALJ gave Plaintiff until January 7, 2009 to file a post-hearing brief, which Plaintiff filed on January 7, 2009.  The ALJ submitted written interrogatories to Medical Expert Dr. Hershel Goren, M.D., board certified in neurology, seeking review of such additional evidence as set forth in Plaintiff's post-hearing brief, which  the ME had not been able to review at the hearing, and ME Goren submitted a written response to same on February 24, 2009.  The ALJ proffered the ME's written response to Plaintiff.  On March 11, 2009, Plaintiff submitted a written response to the ME evaluation of the post-hearing evidence.  (Tr. 11).

continued to meet same through, but not after, December 31, 2009, Plaintiff's date last injured. (Tr. 13).

Plaintiff did not engage in substantial gainful activity or services from September 21, 2004, the alleged injury onset date through the date of the ALJ decision.  20 C.F.R. § 404.1575 and § 404. 1592.  (Tr. 14).

From the alleged date of injury onset through the date of the ALJ's  decision, plaintiff had the following severe impairments pursuant to 20 C.F.R. § 404.920(c) : degenerative disc disease of the lumbar spine,  hypothyroidism and/or Hashimoto's Syndrome, depression and plantar faciitis. (Tr. 14-15).

From the alleged date of injury onset through the date of the ALJ's decision, Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment as set forth in 20 C.F.R. Pt 404, Subpt. P, Appx. 1.  20 C.F.R. § 404.1525 and § 404. 1526.  (Tr. 16).

From the alleged date of injury onset through the date of the ALJ's decision, Plaintiff had the residual functional capacity to perform work subject to certain limitations: sedentary exertional level only which would allow Plaintiff to go from standing or walking to sitting and from sitting to standing or walking at least once every 30 minutes and would not require climbing ladders, ropes or scaffolds and would not be in the proximity of unprotected heights.  (Tr. 18-19).

From the alleged date of injury onset through the date of the ALJ's decision Plaintiff was capable of performing some of her past relevant work, specifically, office cashier.   20 C.F.R. § 404.1565. (Tr. 23-24).

Plaintiff was not under a disability from the alleged date of injury onset through the date of the ALJ's decision.  20 C.F.R. § 404.1520(f).  (Tr. 29A).

## VI. Analytical Overview: Determining Disability

District Court review of Commissioner of Social Security disability determinations is, essentially, appellate in nature, and is limited to evaluating whether the decision made by the Commissioner is supported by "substantial evidence" and consistent with applicable, legal standards. Colvin v. Barnhart , supra, 475 F.3d 727, 729 (6th Cir. 2007).

The "substantial evidence" component of judicial review requires that the Court determine that the Commissioner's decision is based on "more than a scintilla of evidence but less than a preponderance; [and that] it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir. 1994).

Moreover, because district court review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from making credibility determinations. Id. Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that decision is supported by substantial evidence, even if the court were inclined to have decided the case differently. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999). Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side. Listenbee v. Sec'y of Health & Human Servs., 846 F.2d 345, 349 (6th Cir. 1988). Furthermore, the decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion. Smith v. Chater, 99 F.3d 780, 781-82 (6th Cir. 1996).

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability." Colvin, supra, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Colvin, supra, (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

Step 1: Determine whether applicant is engaged in "substantial gainful activity" at the time

12

benefits are being sought.  If yes,  the applicant is not disabled. If no, then move to step 2.[2]

Step 2: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is "severe."  If there is no finding of a "severe" impairment, then there is no disability.  If there is a determination that the applicant suffers a "severe" impairment, move to step 3.[3]

Step 3: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments.  If yes, then the applicant is disabled.  If no, proceed to step 4.[4]

Step 4: Determine if the applicant retains sufficient "residual functional capacity"[5] to allow for the performance of his past, relevant work .  If  the applicant possesses sufficient residual functional

---

[2]  Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized.  20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b).  If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

[3]Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to work. .  20 C.F.R § 404.1521 and 20 C.F.R § 416.921

[4]  The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.   20 C.F.R §§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and  416.926..

[5]  A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. .  20 C.F.R § 404.1520(e) and 20 C.F.R § 416.920(e).  An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applciant's impairments, including those impairments that are not severe, must be considered. 20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

capacity to perform his past relevant work, then there is no disability.   If not, move to step 5.[6]

Step 5: Determine if there are jobs in the current economy that applicant could perform, given the limits of his residual functional capacity and consistent with the applicant's other relevant characteristics.  If there are such jobs, then the applicant is not disabled.  If there are no such jobs, then the applicant is disabled.[7]  See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs.,14 F.3d 1107, 1110 (6th Cir. 1994).  20 C.F.R. § 404.1520 (1982);.);  Tyra v. Secretary of Health and Human Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),. Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

## VII. Standard of Review

The district court shall affirm  the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  McClanahan v. Comm'r of Soc.  474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)).  The Commissioner's findings as to any fact shall be conclusive if

---

[6]  Past relevant work means work performed either as the applicant actually performed it or as it is generally performed in the national economy either within the past 15 years or 15 years prior to the date the disability must be established. Additionally the work must have lasted long enough for the applicant to have learned the job and for it to have become substantial gainful activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[7]  The determination of whether the applicant can do any work at all must take into consideration the applicants residual functional capacity along with the applicant's age, education and work experience.  At this stage the burden is upon the Commissioner to show that work exists in significant numbers within the economy that the applicant can do, given the applicant's limiting characteristics.   20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§ 416.912(g) and 945.960(c)
.

supported by substantial evidence.  Id. (citing 42 U.S.C. § 405(g )).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir. 1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  Id. (citing Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).  Therefore, the reviewing court may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.  Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889 F. 2d 679, 681 (6th Cir. 1989); Garner v. Heckler, 745 F. 2d 383, 387 (6th Cir. 1984)).

**VIII. Discussion**

As noted above, three issues are presented for review in this case: (1.) Whether the ALJ correctly applied the "treating physician" rule in evaluating the opinions of Plaintiff's treating physician within the context of other related evidence including  medical source evidence generally, other medical evidence, Plaintiff's self-assessment and related  issues of weight and credibility; (2.) Whether Plaintiff's impairments met or equaled the listed impairment requirements of Listing 1.04(A) within the scheme set forth in 20 C.F.R. pt. 404, subpt. P, app. 1;  and (3.)  Whether Plaintiff retained sufficient residual functional capacity to enable her to work and whether there are jobs in the economy that she can perform given such limitations as she might have.

Issues Nos. 2 and 3 are distinguishable, but they are both dependent upon Issue No. 1.  That is, the proper analytical pathway toward both Issue No. 2 and Issue No. 3 requires first addressing and resolving Issue No. 1.  A necessary condition for this Court to contemplate either Issue No. 2 or Issue No. 3 requires that Issue No.1 be resolved favorably for Plaintiff[8].

While Plaintiff appears to be asking this Court to determine whether the ALJ gave "appropriate weight" to the opinions of Dr. Zelis and Plaintiff's other treating health care practitioners, the proper review posture for this Court is not to engage in evidence balancing but only to determine whether the ALJ's findings were supported by substantial evidence, consistent with applicable, legal standards.  See, Colvin, supra, 475 F.3d 727, 729 (6th Cir. 2007).

**Plaintiff's Issue No. 1: In reaching his decision that Plaintiff was not disabled The ALJ erred in failing to apply properly the treating physician rule to opinions asserted by Plaintiff's treating sources**

**The Treating Physician Rule**

Analysis of Issue No. 1 turns on determining whether the ALJ addressed the opinions and evidence provided by  Plaintiff's treating physicians in accordance with the so-called "treating physician rule."

The treating physician rule imposes requirements on the manner in which the Commissioner both entertains and gives expression to the opinions of a claimant's treating physician.  First, the

---

[8]  Plaintiff herself acknowledges that Issues Nos. 2 and 3 are dependent upon Issue No. 1, where she states, that "[t]he principal issue in these proceedings is whether the opinions of the Plaintiff's treating physicians - in particular, Dr. Zelis - have been afforded appropriate weight" (Plaintiff's Brief on the Merits, Docket No. 7, 5), and "[w]hen Dr. Zelis's opinions are given appropriate weight, it becomes apparent that [Plaintiff] meets or equals the Listing 104(A) for Disorders of the Spine and that, in the alternative, her residual functional capacity makes her incapable of working on a full time basis."  (Id., at 11).

16

Commissioner shall accord treating physician opinions appropriate deference consistent with the record evidence, and, second, the decisions and determinations that the Commissioner issues must articulate, with appropriate specificity, the Commissioner's reasons for his handling of treating physician opinions.

### Treating Physician Opinion Accorded Deference

20 C.F.R. § 404.1527(d)(2) provides in pertinent part,

> If we find that a treating source's opinions on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

Where appropriate conditions are met, a treating physician's opinions are accorded "substantial, if not controlling deference."  Vance v. SSA, 260 F. App'x 801, 804 (6th Cir. 2008), Warner v. SSA, 375 F.3d 387, 390 (6th Cir. 2004).  The most emphatic application of this rule is that where a treating physician's opinion is uncontradicted such opinion is entitled to complete deference. Howard v. SSA, 276 F.3d 235, 240 (6th Cir. 2002), Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).

Where evidence does not warrant a treating physician's opinions being given controlling weight, treating physician opinions must nonetheless be evaluated in accordance with the criteria set forth in 20 C.F.R. § 404.1527(d)(2)(i) and (ii) which list such factors as duration of physician patient treatment relationship, number and frequency of examinations, nature and extent of the treatment relationship, and others.

### Decisions must articulate, with specificity, rationale for weight accorded Treating Physician Opinions

Where a treating physician opinion is not given controlling weight the Commissioner shall

17

"give good reasons in [the] notice of determination or decision for the weight" accorded to such

opinion.  20 C.F.R. § 404.1527(d)(2).  See, Wilson v. Comm'r of Social Security, 378 F.3d 541, 544

(6th Cir. 2004).

In his decisions  the Commissioner must articulate his reasons for the weight given an

applicant's treating source's opinions.  Id.  When denying benefits the Commissioners decisions shall

> contain specific reasons for the weight given to the treating source's medical opinion,
> supported by the evidence in the case record, and must be sufficiently specific to make
> clear to any subsequent reviewers the weight the adjudicator gave to the treating
> source's medical opinion and the reasons for that weight."

Id., citing. Social Security Ruling 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188, at *5.  See,

also, Rogers v. Commissioner of Social Security, 486 F.3d 234, 242 (6th Cir. 2007).

The Wilson Court explained the two-fold purpose behind this procedural requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that his
> physician has deemed him disabled and therefore "might be especially bewildered
> when told by an administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). The
> requirement also ensures that the ALJ applies the treating physician rule and permits
> meaningful review of the ALJ's application of the rule.

Wilson, 378 F.3d at 544.

Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives

fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of

identifying the reasons for discounting the opinions and for explaining precisely how those reasons

affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the

ALJ may be justified based upon the record." Rogers, supra, 486 F.3d 234, 243.  See also Blakley v.

Comm'r of Soc. Sec., 581 F.3d 399 (6th Cir. 2009) (Sixth Circuit reversed decision of District Court

upholding ALJ decision of nondisability and remanded to the Commissioner).[9]

The threshold consideration before this Court is whether, in rendering his decision, ALJ Bronson correctly applied the law, i.e., the treating physician rule, to the evidence, i.e. the opinions of Plaintiff's treating physicians, and whether he appropriately articulated same in his May 28, 2010 decision.[10]

Plaintiff argues that the ALJ's decision fails to provide specific reasons for having rejected the opinions of Plaintiff's treating physicians. (Plaintiff's Brief on the Merits, Docket No. 7. 10).

Plaintiff asserts that the ALJ failed to show that there were deficiencies in supporting medical evidence sufficient to justify the ALJ not giving controlling weight to the opinion of Plaintiff's treating physician, Dr. Zelis.  For example, Plaintiff argues that the ALJ did not point out that Dr.

---

[9]  In Blakley. supra, the Sixth Circuit found that ALJ had not satisfied the requirements of the treating physician rule because the the of the ALJ's incomplete weighing of treating sources was not an excusable de minimis procedural violation   The Court also noted that it was unable to engage in meaningful review of the ALJ's decision because the ALJ's reasoning was not sufficiently specific to make clear that the ALJ recognized and evaluated the treating relationships of claimant's treating physicians, because the Court could not discern whether ALJ recognized that one of claimant's treating physician treated claimant for a significant period of time after injury and was not merely a consulting source, because there was no evidence in the record that any of the recommendations of the treating sources were so patently deficient that the Commissioner could not possibly credit them, and because claimant's numerous x-rays, CT scans, and MRIs presented objective  findings that were, at the very least, not inconsistent with his treating physicians' opinions.

[10]  A determination that the ALJ failed to apply the treating physician rule correctly would open for consideration whether Plaintiff has a listed impairment or, alternatively whether Plaintiff does not possess sufficient residual functional capacity to allow her to work.  On the other hand, a determination that the ALJ did apply the treating physician rule correctly precludes the necessity of examining either Plaintiff's listed impairment argument or Plaintiffs residual functional capacity argument because, as Plaintiff has noted, with respects to both arguments, each is dependent upon giving appropriate or controlling weight to the opinions of  Plaintiff's treating physicians, which, according to Plaintiff, was not done by the ALJ in this case. (Plaintiff's Brief on the Merits, Docket No. 7, 11, 13).

19

Zelis had opined about a condition different from the conditions for which Dr. Zelis had provided

treatment; or that Dr. Zelis's opinion was contradicted by his own treatment notes; or that Dr. Zelis's

opinion was based on outdated evidence.  (Plaintiff's Brief on the Merits, Docket No. 7, 6-7).

Regarding such deficiencies <u>see, Vance, supra</u>, 260 F. App'x 801, 805 (physician's area of treatment

differs from that about which physician opined); <u>Gaskin v. Comm'r of Soc. Sec.</u>, 280 F. App'x 472,

474-75 (6th Cir. 2008) (physician's opinion conflicts with his treatment notes); <u>Hamblin v. Apfel</u>, 7 F.

App'x 449, 451 (th Cir. 2001) (treating physician's opinion was five years old).

Plaintiff argues that there was substantial medical evidence supporting Dr. Zelis's opinions,

noting Dr. Grenier's 2004 description that Plaintiff's pain was excruciating based on her straight leg

test;  (Plaintiff's Brief on the Merits, Docket No. 7, 7 and Tr. 325-26); Dr. Zachary's observation of

severe leg pain, (Plaintiff's Brief on the Merits, Docket No. 7, 7 and Tr. 288);  Dr. Anderson's 2006

observation that movement in Plaintiff's lumbar spine caused pain across her back (Plaintiff's Brief on

the Merits, Docket No. 7, 8 and Tr. 271); and Dr. Nickel's observation that Plaintiff was totally and

completely disabled and unable to do any work based on an MRI indicating stenosis and several office

visits where Plaintiff exhibited pain and related symptoms, (Plaintiff's Brief on the Merits, Docket No.

7, 8 and Tr. 165).

Plaintiff further argues that the primary basis of ALJ Bronson's rejection of Dr. Zelis's opinion

was the ALJ's opinion that there was <u>an absence</u> of medical records specifically finding Plaintiff to be

as debilitated as Dr. Zelis had opined.  (Plaintiff's Brief on the Merits, Docket No. 7, 10).

Notwithstanding the deference generally accorded treating physician opinions, the Sixth

Circuit has consistently stated that "[the Commissioner] is not bound by the treating physician's

opinions, and that such opinions receive great weight only if they are supported by sufficient clinical

findings and are consistent with the evidence." Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993).

The appropriate question is whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Rogers, supra, 486 F.3d at 242 (citation omitted).   If it is well-supported, then it will be given controlling weight.   If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  Id.  There is an additional requirement associated with the treating physician rule: "the ALJ must provide 'good reasons' for discounting treating physicians' opinions," and the reasons must be "sufficiently specific." Id.

In the current context it is important to keep in mind that a treating physician's opinions on issues such as whether the claimant is disabled and her residual functional capacity, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(e); accord Warner v. Commissioner of Social Security, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted).  As an interpretive rule "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 416.927(d)(4).

**Specific Assertions within the ALJ's Decision Relevant to Treating Physician**

21

**Opinions**

Ultimately, to answer the question raised by Issue No. 1, herein, this Court must look to the particulars of the ALJ's May 28, 2010 decision to determine whether his rejection of the opinion of Plaintiff's treating physician was articulated with sufficient specificity.  Relevant to this issue, the ALJ stated:

> "In a treatment note dated June 11, 2008 (Page 216 of the "F" Exhibits) [see, Tr.118] Dr. Bartal, DPM, said that Ms. Gliebe told him that 'there was complete resolution of symptoms. However she was on vacation the last several weeks and states she was walking several hills in San Francisco. There has been significant relapse of symptoms. Pain is localized to the plantar medial aspect of the left heel.  No other complaints at this time. Physical examination demonstrates significant pain on palpation to the plantar medial aspect of the left heel. No pain is noted on lateral compression of the calcaneus.  Tinel sign is negative.'  There is no later evidence in the record about Ms. Gliebe's symptoms of plantar fasciitis.  In the absence of evidence to the contrary, I conclude that Ms. Gliebe's symptoms of plantar fasciitis were again resolved after a recovery period . . ." (Tr. 16)

Regarding Plaintiff's cervical spine problem secondary to the April 26, 2006 motor vehicle accident, the ALJ noted,

> "However, on June 24, 2006, Dr. Steven A,. Levak, D.C., Ms. Gliebe's treating chiropractor, said (Page 135 of the "F" Exhibits) [see, Tr. 199] that the condition of her cervical spine had returned to what it was prior to the motor vehicle accident, and added: 'She is more than likely to suffer from flare-ups of pain and stiffness in the future.  She has been instructed on how to control her symptoms of stiffness and pain with the use of medications and a home exercise program. If the symptoms worsen or are not helped with the home care program, she was instructed to seek out additional medical care.'  I find no evidence on the record that Ms. Gliebe suffered any further symptoms in, or needed any additional medical care for, her cervical spine."  (Tr. 16).

Regarding Plaintiff's claim to have satisfied the listed impairment requirement for the Listed Impairment in § 1.04 of the Listings the ALJ stated,

> "In making this finding, I considered all of the impairments and evidence cited in Finding #3 above, all of the other evidence in the record, all of the Listed Impairments, and in particular the Listed Impairment in Section 1.04 of the Listing of Impairments.  I also considered what I said in Finding #5 below about the credibility of Ms. Gliebe's allegations of pain and other

22

symptoms, and about the weight given to the opinions of Ms. Gliebe's treating sources, other medical sources, and other health care providers, and the opinions of the impartial medical experts who, without examining Ms. Gliebe, reviewed her case file of the Ohio Bureau of Disability Determination [the "BDD"] and /or the Social Security Administration."  (Tr. 16).

Concerning Plaintiffs degenerative disc disease of the lumbar spine, the ALJ considered Section 1.04 of the Listing of Impairments.  After describing the particular criteria necessary for spinal impairment to meet the requirements of Section 1.04(A) (i.e., nerve root compression, neuroanatomic distribution of pain, limitation of motion of the spine, motor loss, sensory or reflex loss, positive straight-leg raising test in both sitting and supine positions), see, 20 C.F.R. pt. 404, subpt. P app. 1, the ALJ stated,

"In this case, the only evidence in the record for nerve root compression was in a report of an MRI done on June 28, 2005 (see Pages 27 and 168 of the "F" Exhibits).  [See, Tr.308 and 166, respectively].  However, MRIs done before and after this one found no nerve root compression.  The MRI done before this one was done on September 27, 2004 (Pages 23 and 73 of the "F" Exhibits).  [See, Tr. 312  and 262, respectively].  The MRI done after this one was done on February 5, 2008 (Page 174 of the "F" Exhibits). [See, Tr. 160].  I found no evidence in the record for motor loss.  With respect to motor loss, I found evidence to the contrary at Pages 2, 38, 47, 50, 63, and 137 of the "F" Exhibits.  [See, Tr. 333, 297, 288, 285, 272, 197, respectively].  Most of the evidence in the record about sensory loss says that there was none (for example, see Pages 2, 38, 50, and 137 of the "F" Exhibits). [See, Tr. 333, 297, 285, 197, respectively].  The only evidence in the record that I found for sensory loss was at Pages 30 and 63 of the "F" Exhibits. [See, Tr. 305, 272, respectively].  However, at Page 63 of the "F" Exhibits, [see, Tr. 272], Dr. Brian Zella [sic] M.D. said on February 16, 2006 said [sic] that he did 'not have a good physiologic explanation for the patient's decreased pinprick which is an exclusively subjective position of my exam.'" (Tr. 17).

The ALJ further stated,

"In order for a spinal impairment to 'meet' Section 1.04B of the Listing Impairments, there must be evidence of, among other things, spinal arachnoiditis.  In this case, there is no evidence in the record, or insufficient evidence in the record to persuade me, that there was or is spinal arachnoiditis."  (Tr. 17).

The ALJ further stated,

"In order for a spinal impairment to 'meet' Section 1.04C of the Listing of Impairments, there

23

must be evidence of, among other things, pseudoclaudication and 'inability to ambulate effectively', as defined in Section 1.00B2b of the Listing of Impairments.  In this case, there is no evidence in the record, or insufficient evidence in the record to persuade me, that there was or is pseudoclaudication."  (Tr. 17).

After setting forth the requirements of § 1.00(B)(2)(b) of the Listing of Impairments, pertinent

to the issue of being able to ambulate effectively, the ALJ stated,

"There is no evidence in the record, or insufficient evidence in the record to persuade me, that Ms. Gliebe cannot now, and/or could not in the past for a continuous period of at least 12 months, do any of the following  [specifically referring to the particular examples and the criteria set forth in § 1.00(B)(2)(b)(1) and (2) of the Listing of Impairments].  Therefore, there is no evidence in the record, or insufficient evidence in the record to persuade me, that for any continuous period of at least 12 months, Ms. Gliebe had an 'inability to ambulate effectively' as defined in Section 1.00B2b of the Listing of Impairments."  (Tr. 17-18).

"In a letter to Dr. Brian Zelis, M.D., dated October 18, 2004, Dr. Yannick Grenier, M.D. said, 'In conclusion, this is a lady with excruciating what seems to be mostly left-sided S-1 radicular pain.  The source of the pain is not readily accounted for by the findings on the MRI" (Page 9 of the "F" Exhibits)."  [See, Tr. 326].  (Tr. 20).

"On January 6, 2005, Ms. Gliebe told Dr Yannick Grenier, M.D., that she could not drive (Page 12 of the "F" Exhibits.  [See, Tr. 323].  In 2007, Ms. Gliebe told the Social Security Administration that she could drive a motor vehicle and be a passenger in one (Page 11 of the "E" Exhibits)."  [See, Tr. 97].  (Tr. 20).

"In a treatment note dated June 29, 2005, Dr. Thomos Mroz, M.D., said:'At this time, I am not convinced that the source of her [i.e.Ms. Gliebe's] pain is spinal in origin" (Page 43 of the "F" Exhibits)."  [See, Tr. 292].  (Tr. 20).

"In a treatment note dated July 22, 2005, Dr. Adrian M. Zachary, D.O., said: 'Waddell's signs were 3 out of 5' (Page 47 of the "F" Exhibits).  [See, Tr. 288].  During the December 8, 2008 hearing, Dr. Goren, the impartial medical expert, testified that so many Waddell's signs being positive was evidence that the patient [i.e.Ms. Gliebe] was exaggerating."  (Tr. 20).

"In a treatment note dated May 24, 2006, Dr. Steven A Levak, D.C., said: 'The patient [i.e. Ms. Gliebe] reports she is feeling better since her last patient visit.  The patient reports that she believes that her pain levels today to be partially related to some stressful conditions at home' (Page 132 of the "F" Exhibits)."  [See, Tr. 202].  (Tr. 20).

"In a treatment note dated September 18, 2006, Dr. Steven A. Levak, D.C. said: 'Patient reports that she is feeling stiff and sore today and attributes this to recently taking a long air

flight which caused her to stiffen' (Page 143 of the "F" Exhibits).. [See, Tr. 191].  This helped persuade me that her ability to sit was and is much greater than what she has alleged."  (Tr. 20).

"In 2007, Ms. Gliebe told the Social Security Administration that she could and did go shopping and do light housecleaning (Page 11 of the "E" Exhibits). [See, Tr. 97].  At the same time,  Ms. Gliebe told the Social Security Administration that she could not sit for long when watching television, and that she had to either change her position or lie down (Page 12 of the "E" Exhibits). [See, Tr. 96].  At the same time, Ms. Gliebe also told the Social Security Administration that she went to church once per week (id.). [Id.].  Church service usually require prolonged sitting, perhaps with changes of position but with no opportunity to lie down during the service.  At the same time, Ms. Gliebe also told the Social Security Administration that her daily routine included watching television and lying down for a 'short time' (Page 13 of the "E" Exhibits)."  [See, Tr. 95].  (Tr. 20-21).

"In a teledictation that he made on October 31, 2005 and signed on November 7, 2005 (Pages 52-53 of the "F" Exhibits), [See, Tr. 283-82, respectively], Dr. Brian Zelis, M.D., told the BDD, among other things, the following: 'The patient's limitations are complete for any type of physical job or any job where she would have to sit, stand [sic] for prolonged periods of time in one position/' I do not interpret this opinion to mean that Dr. Zelis thinks that Ms. Gliebe is precluded from 'any type of physical' activity, because if he did, she would have to be bedridden, and clearly, Dr. Zelis's opinion did not go that far.  Therefore, I believe and conclude that this opinion of Dr. Zelis's [sic] is fully consistent with the residual functional capacity stated above in the first paragraph of this Finding #5."  (Tr. 21).

"In a teledictation that he made on August 13, 2007 and signed on August 27, 2007 (Pages 168-169 of the "F" Exhibits), [See, Tr. 166-65, respectively], Dr. John H. Nickels, M.D. stated the following. . . . 'We continued her medications and felt, again [he did not explain what he meant by 'again'], due to the work injury as well as motor vehicle injury that this patient was completely and totally disabled and unable to do any work whatsoever.'  I reject this opinion.  Dr. Nickels did not state with specificity what he thought were Ms. Gliebe's physical limitations on her physical abilities to engage in work-related activity.  He based his opinion in large part on a cervical spine impairment that, as stated in Finding #3 above, did not meet the 12 month durational requirement for being considered a 'severe impairment'.  Neither his treatment notes nor any other medical evidence in the record support a conclusion that Ms. Gliebe 'was completely and totally disabled and unable to do any work whatsoever.'  On this point, Dr. Nickels's [sic] opinion was conclusory only, involved vocational issues that, as a physician, Dr. Nickels was not qualified to address, and was on an issue that, as a matter of law, is reserved to the Commissioner of Social Security, or to the Commissioner's designees, to resolve pursuant to 20 CFR 404.1503 and 404.1527(e).  See also SSR 96-5p."  (Tr. 22).

Referring to Dr. Zelis's Physical Residual Functional Capacity Assessment form filled out on

January 9, 2009 and signed and submitted on March 11, 2009, (see, Tr. 109-15), wherein Dr. Zelis

stated, inter alia, that Plaintiff could occasionally and frequently lift and carry up to but no more than

10 pounds: stand and walk a combined total of up to and no more than 2 to 3 hours, sit less than 2

hours and had to lie down the rest of the 8 hour workday; balance only occasionally; Plaintiff could

not push or pull with her left leg;  climb ramps, etc. at all;  stoop, kneel, etc. at all; Plaintiff had to

avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dust, etc; had to avoid

moving machinery, heights, and other workplace hazards.  The ALJ then stated,

> "I found nothing in this opinion, or in any of Dr. Zelis's treatment note, that reconciles these
> opinions of Dr. Zelis's [sic] with those (discussed above) that he submitted to the BDD in the
> fall of 2005.  I found nothing in this opinion of Dr. Zelis's, [sic].in his treatment notes, or any
> other medical evidence in the record, that provides any justification whatever for his opinion
> that Ms. Gliebe should avoid exposure to extreme cold, extreme heat, fumes, odors, dusts,
> gases, poor ventilation, and other air pollutants, and Dr. Zellis's [sic] unsupported opinions on
> these points persuaded me that much of what he said on this form was flawed and lacking in
> credibility.  I did give weight to his opinions that Ms. Gliebe could not carry more than 10
> pounds even occasionally, that she could stand and walk a combined total of no more than 2
> hours per 8-hour workday, that she could not climb ladders, ropes, or scaffolds at all, and that
> she could not work in proximity to unprotected heights, because those opinions were supported
> by the weight of the evidence."  (Tr. 22).

Referring to the opinions of the independent medical expert Dr. Hershel Goren, M.D., who

testified at the December 8, 2008 hearing and submitted on February 24, 2009, responses to

interrogatories pertinent to Plaintiff's post-hearing evidence submission the ALJ stated,

> "Dr. Goren stated the following opinions about Ms. Gliebe.  Her only severe impairment was
> lumbar disc degeneration.  None of her impairments met or medically equaled the criteria for
> any Listed Impairment. . . . There was evidence in the record for sensory deficits and for
> reduced range of motion in the lumbar spine.  The radiologists who did Ms. Gliebe's MRIs
> disagreed about whether or not stenosis was present.  Dr. Goren said that in his experience,
> when radiologists disagreed about that, the disagreement usually meant that the stenosis was
> not there. . . . The presence of Waddell's signs indicated exaggeration. . . . I gave weight to Dr.
> Goren's opinions because they were consistent with the weight of the evidence."  (Tr. 23)

### The ALJ's Decision Complied with the Treating Physician Rule

26

The above detailed recitation of the findings and rationale set forth in ALJ Bronson's decision shows that the ALJ met the threshold specificity requirements of the treating physician rule in reaching his conclusion regarding Plaintiff's disability claim.

It is important to note in this context that the record is replete with sufficient conflicting information that the rule of interpretation articulated in Howard, supra, 276 F.3d 235, 240 and Harris, supra, 756 F.2d 431, 435 - that where a treating physician's opinion is uncontradicted such opinion is entitled to complete deference is - inapplicable in the current case.  Neither Dr. Zelis's nor Dr. Nickel's opinions are uncontradicted by the record and, thus, neither opinion shall be accorded complete deference.

Moreover, the ALJ explicitly acknowledged the treatment provider status of the various physicians and care providers he referred to in rendering his decision.  See, Blakley, supra.

In the current case it is only necessary that the ALJ has given good reasons for rejecting the treating physician's opinion. See, 20 C.F.R. § 404.1527(d)(2), Wilson, supra, 378 F.3d 541, 544 and that such reasons be articulated in his decision with appropriate specificity Id., citing. Social Security Ruling 96-2p, 1996 WL 374188, at *5, Rogers, supra, 486 F.3d 234, 242.  However, as noted above despite the deference generally accorded treating physician opinions, the Sixth Circuit has consistently stated that the treating physician's opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence as a whole.  See,  Bogle.  supra, 998 F.2d 342, 347-48.. The appropriate question is whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Rogers, supra, 486 F.3d at 242.

Review of the ALJ's decision of May 28, 2010 shows the following specific considerations

addressed by the ALJ pertinent to his determination to discount the opinions of Plaintiff's treating physicians:

1.  Dr. Bartal's June, 2008 observation that Plaintiff was on vacation in San Francisco and walked several hills there.  (Tr. 16, 118).

2.  Dr. Levak's June 2006 observation that Plaintiff's cervical spine condition had returned to what it was prior to Plaintiff's April, 2006 motor vehicle accident.  (Tr. 16, 109).

3.  The ALJ's assessment of the credibility of Plaintiff's statements concerning her pain and other symptoms.  (Tr. 16).

4.  The observation that the only evidence in the record for nerve root compression was the MRI report of June 2005, (Tr. 166, 308), and that the the MRI of September, 2004, (Tr. 262, 312), and the MRI of February, 2008 (Tr. 160) did not show nerve compression.  (Tr. 17).

5.  The observation that there was no evidence in the record of motor loss and that there was evidence in the record to the contrary, (Tr. 197, 272, 285, 288, 297, 333).  (Tr. 17).

6.  That most of the evidence in the record concerning sensory loss says that there was none, (Tr. 197, 285, 297, 333).  (Tr. 17)

7.  Dr. Zelis's February, 2006 statement that he did not have a good physiologic explanation for Plaintiff's decreased pinprick (Tr. 17, 272)

8. The observation that there was no record evidence of spinal arachnoiditis.  (Tr. 17).

9.  The observation that there was no record evidence of pseudoclaudication.  (Tr. 17).

10.  The observation that there was no record evidence of the inability to ambulate effectively (Tr. 17-18).

11. Dr. Grenier's statement in his October, 2004 letter to Dr. Zelis that the source of Plaintiff's

28

self-ascribed excruciating pain is not readily accounted for by the findings on the MRI.  (Tr. 20, 326).

12.  Plaintiff's 2007 statement to the SSA that she could drive as well as be a passenger in a motor vehicle, despite having told Dr. Grenier in January, 2005 that she could not drive.  (Tr. 20, 97, 323).

13.  Treating physician Dr. Mroz's July, 2005 treatment note that he was not convinced that the source of Plaintiff's pain was spinal in origin.  (Tr. 20, 292).

14.  The December, 2008 observation by ME Dr. Goren, - based on the July, 2005 treatment note of Dr. Zachary that Plaintiff had 3 out of 5 Waddell's signs - that so many Waddell's signs are evidence that Plaintiff was exaggerating.  (Tr. 20, 288).

15.  Dr. Levak's May, 2006 treatment note that Plaintiff reported that she was feeling beter since her last visit and that her pain levels may have been partially related to some stressful conditions at her home.  (Tr. 20, 202).

16.  The ALJ"s observation that Dr. Levak's September, 2006 treatment note - that Plaintiff reported feeling stiff and had attributed her stiffness to her having recently taken a long air flight - had helped convince him that Plaintiff's ability to sit was greater than she had claimed.  (Tr. 20, 191).

17. Plaintiff's 2007 statement to the SSA that she could and did go shopping and could and did light housework.  (Tr. 20-21, 97)..

18. Plaintiff's 2007 statement to the SSA that she went to church once per week, which, as noted by the ALJ required prolonged sitting.  (Tr. 20-21, 97).

Based on the foregoing, this Court finds that the ALJ did not fail to comply with the requirements of the treating physician rule in reaching and setting forth his decision in this case. Therefore, this Court finds, as to Plaintiff's Claim of Error No. 1, that the ALJ's evaluation of the

29

opinions of Plaintiff's treating physicians was not in error and that there was substantial evidence in the record to support the ALJ's decision regarding the opinions of Plaintiff's treating physicians and, ultimately, for finding Plaintiff not disabled. Accordingly, Plaintiff's Claim of Error No. 1 is DENIED.

Despite having already adduced in this Report and Recommendation that it was necessary for Plaintiff to prevail on her treating physician argument for her to prevail on either of the two remaining issues, i.e, whether Plaintiff met the requirements of Listing 1.04 of the Listing of Impairments or whether Plaintiff retained sufficient residual functional capacity to enable her to work, this Court shall briefly address each of Plaintiff's remaining claims of error.

**<u>Plaintiff's Issue No. 2</u>: The ALJ erred in failing to find that Plaintiff met or functionally equaled Listing 104(A) for disorders of the spine**

Plaintiff argues that she met the listing requirements of Listing 1.04(A) within the scheme set forth in 20 C.F.R. pt. 404, subpt. P, app. 1.

Listing 1.04(A) states:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 1.04(A).

Therefore to meet the requirement of Listing 1.04(A) Plaintiff had to show that there was evidence of, <u>inter alia</u> (i) nerve root compression.

30

Plaintiff states that the ALJ mischaracterized the evidence pertinent to establishing her 1.04(A) claim when he asserted, "the only evidence in the record for nerve root compression was in a report of an MRI done on June 28, 2005."  (Plaintiff's Brief on the Merits, Docket No. 7, 11).  (Tr. 17). (emphasis added).   Suggesting that there was additional evidence in support of her Listing 1.04(A) claim, Plaintiff asserted the following:

> That MRI [the 6/28/2005 MRI referred to in the ALJ's decision, above] showed mild stenosis at L4-5. (R. at 308.) Two previous MRIs did not definitively show stenosis (R. at 309, 311). However, Mrs. Gliebe was consistently diagnosed with stenosis before such was objectively were confirmed by the June 28, 2005 MRI. (R. at 288, 293, 297). The ALJ relies on the opinion of Dr. Goren, the medical expert at the hearing, to find that the "radiologists disagreed on whether or not stenosis was present" and that such a disagreement "usually meant that the stenosis was not there." (R. at 23.)3 However, the January 1, 2008 MRI showed that Mrs. Gliebe's condition had "progressed since the previous study." (R. at 160). Dr. Goren admitted in testimony that this statement "alleged to show a slight progress of the – cf canal stenosis." (R. at 358.) Dr. Goren ultimately conceded that there was no disagreement between the radiologists as to whether Mrs. Gliebe suffered from stenosis, only that the stenosis was not readily apparent in the earliest MRIs and became so apparent in mid-2005.

(Plaintiff's Brief on the Merits, Docket No. 7, 11).

Thus, Plaintiff bases her argument that the requirements of Listing 1.04(A) were satisfied by adverting to record evidence suggesting that Plaintiff suffered L4-5 stenosis.

However as Defendant has quite aptly argued (see, Defendant's Brief on the Merits, Docket No. 12, 11-13), Plaintiff has not produced evidence proving or suggesting nerve root compression but only stenosis.  It would seem that Plaintiff would confound this issue by failing to delineate the distinction between the two.  Spinal stenosis is a narrowing of the spinal column or a narrowing of the openings where the nerves leave the spinal column, whereas nerve root compression is pressure on the

nerve.[11]

Moreover, the June 28, 2005 report to which the ALJ refers as "the <u>only evidence</u> in the record for nerve root compression" does <u>not</u> diagnose or refer to nerve root compression.  Rather, that MRI report only identified the conditions of lower back pain and left lumbar radiculopathy, disc degeneration at L4-5 and L5-S1, findings of previous surgery on the left at L5-S1, mild degenerative stenosis at L4-5, no frank, recurrent herniation at L4-5 or L5-S1, no pathologic signal intensity in the vertebral bodies, conus medullaris normal, no enhancing lesions were seen, degenerative and post surgical changes in the lower lumbar region.  (Tr. 308).

Additionally, Both Drs. Grenier and Anderson noted that there was no evidence of nerve root compression (Tr. 263, 272).

Plaintiff has, therefore, failed to prove or suggest there is evidence supporting her contention that she meets or equals Listing 1.04(A).  <u>Elam ex rel. Golay v. Comm'r of Soc. Sec</u>., 348 F.3d 124, 125 (6th Cir. 2003). ("In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. It is insufficient that a claimant comes close to meeting the requirements of a listed impairment.") (citations omitted).

Plaintiff also argues that she has impairments that medically equaled Listing 1.04(A) (Plaintiff's Brief on the Merits, Docket No. 7, 11).  However, Plaintiff offers no explanation of how she has equaled the listing. <u>Bingaman v. Comm'r of Soc. Sec</u>., 2006 WL 1827616, *3  (6th Cir. June 29, 2006)  ("[Plaintiff] bears the burden of demonstrating that his impairment meets or equals [the]

---

[11]  For definitions of these two distinguishable conditions see, Spinal Stenosis: http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001477/, and Nerve Compression: available at: http://www.spine-health.com/glossary/n/nerve-compression

Listing . . ..").   Lusk v. Comm'r of Soc. Sec., 106 F. App'x 405, 411 (6th Cir. 2004) (although

Plaintiff has a severe health condition he failed to cite "any medical evidence that is at least equal in

severity and duration to the requirements of [the] Listing . . ..").   Indeed, in the present case,

the record shows that Plaintiff did not equal Listing 1.04(A).  Dr. Goren, the medical expert, testified

that Plaintiff did not meet or equal a listing.  (Tr. 356-57).   A medical expert's testimony that a

claimant failed to meet or equal a listed impairment is sufficient.  See Walker v. Barnhart, 72 F. App'x

355, 357 (6th Cir. 2003).

     Dr. Goren's testimony is uncontradicted in this regard.   The state agency physician who

reviewed Plaintiff's file also found that she did not meet or equal a listing.   (Tr. 26, 27 referring to Tr.

167).  See Social Security Ruling 96-6p, 61 Fed. Reg. 34.366 (July 2, 1996)  ("The signature of a State

agency  medical or psychological consultant on an SSA831-U5 (Disability Determination and

Transmittal Form) . . .  ensures that consideration by a physician (or psychologist) designated by

the Commissioner has been given to the question of medical equivalence at the initial and

reconsideration levels of administrative review.").

     Therefore, in the current case, it was reasonable for the ALJ to find that Plaintiff did not

medically equal Listing 1.04(A) (Tr. 16).

     Therefore, for the reasons stated above, this Court finds, as to Plaintiff's Issue No. 2, that the

ALJ did not err in failing to find that Plaintiff met or functionally equaled Listing 1.04(A) for

disorders of the spine and that there was substantial evidence in support  thereof.  Accordingly,

Plaintiff's Claim of Error No. 2 is DENIED.

     **Plaintiff's Issue No. 3: The ALJ erred in finding that Plaintiff retained sufficient residual
functional capacity to enable her to work and that there are jobs in the economy that she
can perform**

Plaintiff premises her argument - that the ALJ erred in finding that she retained sufficient residual functional capacity to enable her to work and that there were jobs in the economy that she could perform - on the proposition that Plaintiff's treating physicians' opinions should be accorded controlling weight.  "When the opinions of [Plaintiff's] treating physicians are give due controlling weight, it becomes clear that she is incapable of working on a full time basis."  (Plaintiff's Brief on the Merits, Docket No. 7, 13).   As this Court has amply established, supra, in the current case the opinions of Plaintiff's treating physicians were not given controlling weight.  On this basis alone, this Court find's Plaintiff's Claim of Error No. 3 to be without merit and the ALJ's RFC determination supported by substantial evidence.

In addition to the above rationale, this Court has also addressed specific argument Plaintiff sets forth in Plaintiff's  Issue No. 3

ALJ Bronson's RFC determination provided that Plaintiff "had and has the residual functional capacity to perform work activities except for the following limits on her ability to work . . ."  (Tr. 18).  The ALJ stated that Plaintiff could perform work at the "sedentary" exertional level, with all that is implied by such limitation relative to exertional and postural limitations, she cannot do work at any other exertional level, and she must be allowed to go from either standing or walking to sitting, and from sitting to either standing or walking at least once every 30 minutes.  (Tr. 18-19).

In his decision the ALJ noted that Vocational Expert Bruce Holderead testified at the December 8, 2008,  hearing that Plaintiff's past relevant work experience included working as an office cashier, and that the Dictionary of Occupational Titles calls the job Cashier I with the job number 211.362-010 describing it as skilled work usually done at the "sedentary" exertional level. (Tr. 24, 387).  This job was one of the three jobs Plaintiff had held within the 15 years prior to the

34

hearing that was definitely SGA.  (Tr. 387).  The VE also described other work that Plaintiff had done, leasing agent, which is skilled and  usually done at the light level and home health aide and/or home attendant which is semiskilled and medium.  (Tr. 24, 387-88).

Of these jobs only one constituted past relevant work because either Plaintiff's earnings from these jobs were below the minimum levels or because Plaintiff had done these jobs more than 15 years earlier 20 C.F.R. § 404.1574.   That job was office cashier.  (Tr. 24, 387, 389-90).

The VE stated that this job, office cashier, as performed in the national economy per the DOT was a "skilled, SVP of 5, sedentary" position.  (Tr, 387). The VE noted that Plaintiff had actually performed this job at the "medium" exertional level and that the skills Plaintiff acquired doing that job were transferable.  (Tr. 24, 387, 389-90).

The VE stated that there are other sedentary jobs in the national economy to which the skills Plaintiff had acquired as an office cashier would be transferable.  (Tr. 390). The VE gave three examples of these other occupations, check writer (DOT 219.382-010), which is semiskilled and sedentary; billing clerk (DOT 214.482-010), which is semiskilled and sedentary; and check cashier (DOT 211.462-026), which is semiskilled and sedentary.  (Tr, 24, 390).

At the hearing the ALJ asked VE Holderead whether a hypothetical person, limited to sedentary work only, with the same characteristics and limitations attributed to Plaintiff in the ALJ's residual functional capacity assessment and, specifically, that the person had "to be able to go from either standing or walking to sitting, or vice versa, at least every 30 minutes"  would be able to do any of Plaintiff's past relevant work either as it is done generally or as Plaintiff had actually done it.  (Tr. 24-24A, 390-92).

VE Holderead answered this question in the affirmative and further testified that Plaintiff could

not do her past relevant work as an office cashier as she had <u>actually</u> done it, because Plaintiff had

actually performed that work at the <u>medium</u> exertional level; but that because this past relevant work

of office cashier is usually done in the national economy at the <u>sedentary</u> exertional level that Plaintiff

could perform it.  (Tr. 390-92).

      Relevant to this consideration the following exchange took place between the Plaitniff's

counsel (Q) and then the VE (A) and then the ALJ and Plaintiff's counsel:

Q.  The cashier's job, are you talking about a cashier that works, for instance, at the
    checkout counter where people come - -

A.  No.

Q.  - - through?  That's not what you're talking about.  It's an office cashier.

A.  It's an office cashier, which is - -

Q.  Which is different.

A.  She indicated she did.

Q.  Okay.  And you're saying that's a sedentary job.

A.  Yes, it is.

Q.  Okay.  What about carrying - -

ATTY:  Your Honor, I don't know that we had an opportunity for her to testify about that job.
    May I ask her, to question her, too?

ALJ:    Yeah  - -  well, remember that job, she said she did it medium, and we've agreed she
    can't do it now  - -

ATTY:  Okay.

ALJ:  - -  as she actually did it.  He's saying that it can be done  - -  that the hypothetical
    person  could do it as the DOT says it's usually done in the national economy.

ATTY: Okay.  All right.

ALJ:   You know, but Mr. Holderead ruled out her ability to do it as she, herself, actually did it - -

ATTY: Okay.

ALJ:   - - in the past.

ATTY:  All right.

. . .

ALJ:     . . .  By the way, for the record, my hypothetical is based largly on her testimony.

ATTY: I know.

(Tr. 392-93, 394).

In response to questions posed by Plaintiff's counsel at the hearing, the VE distinguished the job of office cashier from other cashier jobs by noting that the office cashier job did not involve "ringing up" sales to customers.  (Tr. 24A, 392).  The VE also stated that the person doing this office cashier job would have no problem meeting the sit/stand options as set forth in the ALJ's hypothetical. (Tr. 24A, 392, 394-95).

Regarding this factor, Plaintiff argues in support of her claim of error that:

At the hearing, the vocational expert, Bruce Holderead, testified that "if you said they had to stand 30 minutes every hour, and they had to sit 30 minutes every hour, then it would be a problem" maintaining full-time employment (R. at 395-95.) He later testified that no jobs existed in the national economy for a person limited to sedentary work and having to go from standing or walking to sitting, and vice versa, every thirty minutes, but could not work a full eight hour work day. (R. at 402.) Because Mrs. Gliebe is limited to standing only two to three hours and sitting less than two hours, she cannot complete an eight hour work day without standing thirty minutes every hour or sitting thirty minutes every hour. Therefore, there are no jobs in the national economy which Mrs. Gliebe can perform and she is incapable of working on a full time basis.

(Plaintiff's Brief on the Merits, Docket No. 7, 13).

Plaintiff's recitation of the discussion with the VE at the hearing is not altogether complete.

37

The following Q and A between Plaintiff's counsel and the VE will provide clarification.

Q.  Mr. Holderead, doesn't the fact that the person has to get up and either sit, walk or stand every 30 minutes, can't that affect the job as an office cashier?

A.  I wouldn't say, you know, we're not - - at least in the hypothetical, we're not saying the person has to walk around for 30 minutes, they just need to get up and stretch a minute, and maybe move a minute or two.  They're going to be - - you know, that job's going to require some getting up and moving around, so certainly there's some flexibility there.  I don't see that as being a problem.

Q.  Okay.

A.  Now if you said they had to stand 30 minutes in every hour, and they had to sit 30 minutes in every hour, then it would be a problem, but not the fact that they just have to change positions every 30 minutes.

(Tr. 394-95).

Review of the foregoing exchange makes it clear that the remark imputed to the VE upon which Plaintiff bases his argument, i.e.  "if you said they had to stand 30 minutes every hour, and they had to sit 30 minutes every hour, then it would be a problem," supra, was taken out of context and did not represent the VE's full statement at the hearing.  Indeed, the VE clearly understood the restriction discussed above to mean that the Plaintiff would need to move about for a few minutes ever 30 minutes or so and not that the Plaintiff would have to move to a new position (e.g., sitting to standing) and have to stay in that new position (i.e., standing) for a full 30 minutes. Thus, Plaintiff bases her argument in this regard upon a distorted interpretation of the hearing testimony.

Regarding Plaintiff's statement, supra, that the VE ". . . later testified that no jobs existed in the national economy . . . " that Plaintiff could perform.  (Plaintiff's Brief on the Merits, Docket No. 7, 13).  .  This comment, too, was taken out of context.

Near the close of the hearing the ALJ inquired into Plaintiff's thyroid condition and

contemplated what effect the worsening of that condition might have upon her ability to work

      Specifically with regard to Plaintiff's thyroid condition and the possibility of it worsening  the

following exchange took place:

> ALJ:  . . . You know, if I were to get an RFC opinion, say, from an endocrinologist of the possibility of a later onset date, might have to be entertained but, of course, we could be - - it'd be very late.  I mean, we're talking about, you know, if her thyroid has taken a turn for the worst [sic], we'd have to show that there's a level of fatigue here that when combined with her spinal problems  - -  first of all, that makes the thyroid a severe impairment, and, secondly, puts her down to the point where she just can't work full time anymore.

> CLMT:   In the past month, I went from 75 milligrams [sic, micrograms] to 88, now 100, and she still - - and I have to go back again.  She may be changing it, so - -

> ALJ:  Well, but if they can get it down under control in 12 months, then that would be  - - but, Mr. Holderead, second hypothetical for you.  This person cannot work a full eight hours a day, cannot work a full eight hours a day.  Can this person, this hypothetical person, do any of the claimant's past relevant work?

> VE:   No, Your Honor.

> ALJ:   And are there other jobs in the national economy this hypothetical person could do?

> VE:   No, Your Honor.

> ALJ: That's what I thought, but I wanted to get it on the record.  Okay, counsel, you know what        you need to do.

> ATTY:   Okay, Judge.  Thank you very much.

(Tr. 401-03).

      It is clear that the reference to being "incapable of working on a full time basis," which

Plaintiff makes in her Issue No. 3, arose out of the above cited discussion at the hearing regarding the

possible worsening of Plaintiff's thyroid condition and, in particular, the second hypothetical that the

ALJ posed to the VE regarding that possibility.  However, Plaintiff, neither in her argument in support

of Plaintiff's Issue No. 3, nor elsewhere in Plaintiff's Brief on the Merits, affirmatively and with specificity argues that Plaintiff's thyroid condition has worsened or otherwise on its own or in connection with Plaintiff's other impairments or conditions makes her disabled..

Therefore, for the reasons stated above, this Court finds, as to Plaintiff's Issue No. 3, that the ALJ did not err in finding that Plaintiff retained sufficient residual functional capacity to enable her to work and did not err in finding that there were jobs in the economy that she could perform and, moreover,  that there was both substantial evidence to support the ALJ's RFC finding and substantial evidence to support the ALJ's determination that there were jobs in the economy that Plaintiff could perform.  Accordingly, Plaintiff's Claim of Error No. 3 is DENIED.

## **CONCLUSION**

For these reasons, the Magistrate recommends that the the decision of the ALJ in this case be AFFIRMED.

 /s/Vernelis K. Armstrong
Vernelis K. Armstrong
Date:  December 30, 2011          United States Magistrate Judge

### **Notice**

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have fourteen (14) days after being served in which to file objections to said Report and Recommendation.  A party desiring to respond to an objection must do so within fourteen (14) days

after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.